IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )        No.  07 CR 0149
        v.                       )
                                 )        Judge Robert W. Gettleman
ALFRED SANCHEZ and AARON DELVALLE,  )

**<u>MEMORANDUM OPINION AND ORDER</u>**

After a lengthy trial, the jury convicted defendant Alfred Sanchez of four counts of mail
fraud in connection with an allegedly fraudulent hiring and promotion scheme involving
departments of the City of Chicago, particularly the Department of Streets and Sanitation of
which Sanchez was the Commissioner.  The jury also convicted defendant Aaron Delvalle of the
single count of perjury with which he was charged, resulting from his grand jury testimony about
his role in the hiring scheme.

Defendants have filed post-trial motions seeking acquittal based on a lack of sufficient
evidence to convict, and requesting a new trial on a number of grounds, the most serious of
which involves an alleged failure by the government to disclose impeachment evidence
concerning one of its witnesses in violation of the standards established by <u>Brady v. Maryland</u>,
373 U.S. 83 (1963), and its progeny.[1]  Because the court has concluded that defendants are
entitled to a new trial due to the <u>Brady</u> violation, there is no need to address the other issues
raised by defendants in their post-trial motions at this time.

---

[1]The other grounds for seeking a new trial include alleged improper jury selection in
violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the use of a special verdict form, failure to
sever the defendants for trial, and the playing of the recording of Delvalle's grand jury
testimony.

## FACTS

Defendant Sanchez held a number of full-time salaried positions with the City of Chicago ("City") from 1989 through June 2005, including First Deputy Director of the Mayor's Office of Inquiry and Information ("I&I") prior to 1995, and Commissioner of the Department of Streets and Sanitation ("Streets & Sanitation") from June 1999 through June 2005. Streets & Sanitation was the department with the largest number of employees in the City. Sanchez was also a high ranking official in the Hispanic Democratic Organization ("HDO"), a political organization that, among other activities, supported candidates favored by Mayor Richard M. Daley, who held office during the relevant period, and his political allies. Delvalle was a younger, active member of HDO and an employee at Streets & Sanitation, working closely with Sanchez, who was a sort of mentor to him.

The indictment charged Sanchez, along with a number of unindicted individuals (including Delvalle in the mail fraud counts) with engaging in "a scheme and artifice to defraud the people of the City, applicants for City jobs, and the City, of money, property and the intangible right to the honest services of Sanchez and other City employees" through a "systematic effort to provide public financial benefits, in the form of City jobs, promotions, and other job-related benefits . . . in order to induce and reward campaign work to benefit HDO and other private political organizations." Simply put, the alleged scheme involved manipulating the City's hiring and promotion process to reward with City jobs individuals who worked effectively for HDO and contributed money and favors to Sanchez, all of which is prohibited by an array of City ordinances and state laws. Such "patronage" activities are also prohibited by a civil consent decree continuing to be enforced by another judge of this court in the case of <u>Shakman v. The</u>

Democratic Organization of Cook County, 69 C 2145 (the "Shakman Decree").  The mail fraud counts against Sanchez are based on nine discreet mailings caused by Sanchez that contained various false information connected to the fraudulent hiring scheme.[2]

The government presented a number of witnesses and documentary evidence to demonstrate that Sanchez knew of and took part in a wide-spread scheme in which individuals who performed political work on behalf of the Democratic Party in Chicago were rewarded with jobs and promotions at the expense of applicants and employees who were not part of the program.  Witnesses testified that before he became Commissioner of Streets & Sanitation in 1999, Sanchez was a willing functionary in the scheme, in which the Mayor's Office of Intergovernmental Affairs ("IGA") was used improperly to hire certain individuals who performed political work through the HDO and other political entities.  The scheme involved the use of false rating reports approved or directed by Sanchez and others at IGA and I&I in violation of the Shakman Decree.

According to a number of government witnesses, after becoming head of Streets & Sanitation Sanchez used his position as Commissioner to direct his subordinates, including defendant Delvalle, to reward HDO volunteers with City jobs in return for their political work on behalf of the Democratic Party and its candidates.

Sanchez's principal defense was based on evidence, including his own testimony, that he was a hard-working, hands-on Commissioner of Streets & Sanitation who never intended to cheat the government of his honest services or to hire or promote anyone who was not qualified.

---

[2]The government dismissed two counts prior to verdict, and Sanchez was acquitted of three of the remaining seven counts in the indictment.

Without denying that he was aware that certain people whom he recommended or approved to be hired were also active members of HDO, Sanchez vigorously denied that their political activities played any part in the hiring decisions.

The evidence supporting the government's charge that Delvalle committed perjury in testifying before the grand jury related to the questions put to him regarding his political activities at HDO and his role in the scheme as one of Sanchez's top aides at both Streets & Sanitation and HDO. Several witnesses testified that Delvalle played a central role in getting City jobs for people who were recommended because of their political work by participants in the scheme. Delvalle's principal defense was based on evidence, including his own testimony, that he was merely and innocently following the lead of his superiors, and that his involvement with HDO-related hiring was limited to checking a "lottery list" of applicants when HDO coordinators inquired about the hiring status of HDO volunteers. Delvalle went to great lengths to establish his bona fides as a clean cut, hard-working young man whose political activities were largely divorced from his work for the City at Streets & Sanitation.

The Brady violation involves the testimony of one of the government witnesses, Brian Gabriel ("Gabriel"), a "motor truck driver" who began working at Streets & Sanitation in 2000. Gabriel testified that he joined HDO as a "foot soldier" in 1998 in order to get a job with the City, a goal that he had been unable to achieve prior to working for HDO. He was directed by HDO coordinators, including Delvalle, to participate actively in a number of political campaigns chosen by HDO. Although he did not have direct contact with Sanchez, he testified to knowledge that jobs were rewarded through a "chain of command" reaching from HDO coordinators, including Delvalle, to Sanchez. Gabriel was the first witness to use this phrase,

which the government used repeatedly in its opening statement and closing argument to describe how Sanchez directed political hiring through his subordinates.

Gabriel also testified that he heard Sanchez tell a group of political volunteers that "hard work deserves reward."  When asked by the prosecutor what this meant, Gabriel stated that he understood Sanchez to mean that working for HDO "would be rewarded with either employment or a promotion or whatever."  Gabriel was the only witness to put such incriminating words directly into Sanchez's mouth.  Gabriel also testified that he bought $1,200 in tickets for political events from John Resa, an HDO operative who had arranged to get Gabriel his first City job as a seasonal motor truck driver[3] by giving a copy of Gabriel's CDL and his application receipt to Sanchez.  Gabriel also testified that he gave Sanchez personal gifts, including a box of cigars and one or two hundred dollars in cash, and that Sanchez never thanked him.

With respect to Delvalle, as mentioned above, Gabriel testified that Delvalle was an HDO coordinator in the "chain of command."  In addition, over Delvalle's objection, Gabriel testified about an altercation that he had with Delvalle that led to Gabriel's cutting his ties with HDO. The altercation occurred because Delvalle, who was married with children, allegedly made passes at Gabriel's fiancee at an event.

In preparing for trial, Brian Etchell, the FBI case agent working with the Assistant U.S. Attorneys ("AUSAs") prosecuting this case, conducted a criminal background check, including

---

[3]According to Gabriel, Resa had told a gathering of HDO workers in 1999 how to apply for the job, and that he (Resa) had the answers to the commercial drivers license ("CDL") test for those who didn't have a CDL.  No other witness testified about cheating to get a required license.

an "ACS"[4] check on Gabriel in December 2008, several months before the trial began on March 3, 2009. An ACS check is an electronic search of the FBI database to determine whether a person is currently under criminal investigation. Although the criminal background check on Gabriel disclosed a 1989 burglary conviction (which the prosecution disclosed to defense counsel) and 18 arrests, including one for drug dealing in 2005 (which the prosecution did not disclose to defense counsel), it did not disclose any current criminal investigation involving Gabriel.

Prior to the beginning of the trial on March 3, 2009, AUSA Steven Grimes and Chicago FBI agents interviewed Gabriel on two occasions (February 5 and February 25, 2009) to prepare him for his testimony. At the latter meeting, Agent Etchell asked Gabriel about each arrest listed on his "rap sheet," and the information revealed on the rap sheet led Agent Etchell to ask Gabriel whether he had been in a gang. Gabriel stated that he had been a member of the Spanish Vice Lords a long time ago, but that he was no longer affiliated with a gang and had put that life behind him when he became a father. Although, as mentioned above, the government disclosed Gabriel's burglary conviction to the defense prior to trial, for some reason it did not disclose Gabriel's prior arrest record or gang activity even though it was the arrest record that led to the discovery of the gang activity. Nor did the government follow up with any other investigation, including an ACS check, prior to Gabriel's testimony at the trial on March 9, 2009.

Unbeknownst to the prosecutors or case agents in the instant case, at the very time they were interviewing Gabriel, and indeed at the very time Gabriel testified at trial, he was under investigation by the "Illiana Gang Task Force," ("Illiana Task Force"), which was comprised of

---

[4]According to FBI Agent Pohl, ACS stands for "Automated Case Support."

local law enforcement officers from Indiana and Illinois, including Chicago Police Department officers, as well as FBI agents located in northern Indiana. As it turns out, Gabriel had lied to AUSA Grimes and the FBI agents involved in the prosecution of the instant case when he denied current gang activities.[5] In fact, in February and March 2009 Gabriel was a high ranking member of the Spanish Vice Lords, a violent Chicago street gang, and, on or about February 8, 2009 (a month and a day before he testified in the instant case), he had been so identified by a confidential informant ("CI") to the FBI in the Northern District of Indiana's Gang Response Investigative Team as a source of narcotics. As a result, the FBI's Northern District of Indiana office opened an investigation of Gabriel on February 10, 2009, and made two controlled buys of cocaine from him, one on that date and one on February 26.

As described by Indiana-based FBI agents Elana Iataroloa and Adam Pohl at an evidentiary hearing conducted by this court on October 19, 2009, the investigation of Gabriel was part of "Operation Overlord" run out of the US Attorney's Office in Hammond, Indiana (which borders Chicago). Among the targets of this operation was a gang war in northern Indiana and Chicago between the Spanish Vice Lords and the Latin Kings street gangs. In addition to Agent Pohl, the Illiana Task Force included Indiana state police and four Chicago police detectives, one of whom had brought the CI who identified Gabriel to the attention of Agent Iataroloa (who was supervising Operation Overlord).

---

[5]Intentionally making a false statement to a law enforcement officer conducting a criminal investigation would constitute a felony under 18 U.S.C. § 1001.

After the Indiana FBI agents opened their investigation of Gabriel on February 10, 2009, they did an ACS check and discovered two FBI "302" forms[6] prepared by Agent Etchell, one from October 2006 and the other from February 2008. The October 2006 form is five pages in length and relates in great detail an interview with Gabriel on October 11, 2006, that centered on Gabriel's connection with HDO and his knowledge of and contacts with Sanchez and Delvalle. This form 302 also disclosed that Gabriel was currently employed by the City of Chicago. The one page February 2008 form 302 states in its first substantive paragraph:

> GABRIEL has not seen AL SANCHEZ since the day after SANCHEZ was indicted (understood by undersigned agent to be 3/23/2007). SANCHEZ was at a 7-11 purchasing a newspaper that had his picture on the front page.

Each of the form 302s was read by the Illiana Task Force FBI agents and contained the Chicago FBI's investigative file number (194B-CG-118938). At the evidentiary hearing conducted by this court on the instant motions, Agent Iataroloa testified that, although she was supervising Operation Overlord that included gang activities in northern Indiana and Chicago, she did not read Chicago newspapers and was not familiar with political or legal news coming from Chicago. Because, as Agent Iataroloa repeated several times, she found the information in the form 302s from the Chicago FBI to be unrelated to her investigation of gang activity in Indiana and Chicago, she regarded the 302s as being "unremarkable." Agent Pohl testified that he does watch Chicago television, that he had heard of Al Sanchez, and that he knew the trial was proceeding in March 2009. Sometime in early March 2009 (while the instant trial was proceeding) one of the Chicago police officers assigned to the Illiana Task Force, Sgt. Sean

---

[6] "302s" are reports prepared by FBI agents memorializing interviews with witnesses, targets and suspects.

Martin, obtained phone records as part of his investigation of Gabriel, and learned that Gabriel

had made several telephone calls to the Chicago FBI office. Sgt. Martin testified that in early to

mid-March 2009 (before the trial concluded) he mentioned to the other agents in the Illiana Task

Force, including Agent Iataroloa, that the Al Sanchez/HDO trial (a "big case") was going on in

Chicago.

Despite knowing that Gabriel was a City employee who had been interviewed on two

occasions by the Chicago FBI in connection with the Sanchez case, and having identified

Gabriel as a high ranking member of the Spanish Vice Lords who was currently involved in drug

dealing and had been arrested for drug dealing in 2005, and despite knowing that Sanchez had

been indicted and was currently on trial in Chicago, none of the agents or officers in the Illiana

Task Force who had seen the 302s notified the Chicago FBI or the U.S. Attorney's Office in

Chicago about their investigation of Gabriel, his then-current gang activities, or the controlled

buys that they had just recently completed from him.

For their part, neither the Chicago FBI nor the AUSAs involved in the instant case did a

follow-up investigation of Gabriel before presenting him to the court and the jury on March 9,

2009. It is uncontested that an ACS check would have disclosed the Illiana Task Force's

investigation of Gabriel. Further, both Agents Iataroloa and Pohl conceded that had they been

conscious of the fact that Gabriel was going to be a witness in a criminal trial in Chicago they

would have been under an obligation to inform the Chicago authorities prosecuting that trial of

the Illiana Task Force's investigation.

On April 30, 2009, after conclusion of the trial, the government filed a "Notice to Court,"

which stated that Agent Etchell had received a call from an Indiana FBI agent on April 22, 2009,

in which the Indiana agent told Etchell that the Indiana Gang Response Investigative Team was investigating Gabriel for drug trafficking. The next day, April 23, 2009, according to Agent Pohl, Gabriel had been lured to Pohl's Hammond office on a "ruse" devised by the Indiana agents. Agent Pohl had called Gabriel and told him that he (Pohl) "had some follow-up questions regarding the Al Sanchez interview that he gave a while back." Gabriel had responded that he was surprised, and a bit skeptical, that he would not have received the call from Agent Etchell. Nevertheless, Gabriel went to Agent Pohl's office, at which time he was confronted with the Illiana Task Force's investigation and admitted his drug trafficking activities and agreed to cooperate in the investigation.

After receiving the call from the Indiana agent, Agent Etchell promptly notified the AUSAs who were prosecuting the instant case, who contacted their counterparts in the U.S. Attorney's Office for the Northern District of Indiana. For some reason it apparently took another week for the latter office to inform the prosecutors in the instant case about the details of their investigation of Gabriel. In addition to the information described earlier in this opinion, the AUSAs in the Northern District of Indiana informed their Northern Illinois counterparts that the Indiana FBI agents (presumably Agents Iataroloa and Pohl) had confronted Gabriel on April 23, 2009, and "he admitted his participation in criminal narcotics trafficking and agreed to cooperate with the Indiana FBI's ongoing investigation."

Because at the time of the April 30 "Notice to Court" Gabriel was continuing to cooperate in covert operations, the government requested the court to delay informing the defendants in the instant case of these developments until no later than May 31, 2009, shortly after the post-trial motions in this case were due to be filed. The government also informed the

court that at the time Gabriel testified on March 9, 2009, to the best of their knowledge Gabriel

was not aware that he was under investigation by the Illiana Task Force. Of course, Gabriel

knew that he was a high ranking gang member and a drug dealer, and consequently that he had

lied to the prosecution team in the instant case on February 25, 2009. The government also

requested the court to keep its "Notice to Court" under seal. The court granted both of these

requests. When the court inquired of AUSA Shah when he presented the "Notice to Court" in

chambers about what they would have done had they known that Gabriel was being investigated

at the time he testified in the instant case, Mr. Shah responded that the government would likely

not have called him as a witness.

On May 29, 2009, earlier than originally anticipated, the government notified defendants

of the information about Gabriel described above, and the court suspended post-trial briefing to

allow the parties to investigate and address the issue.

As it relates to the Gabriel matter, defendants' motions for a new trial are based on,

(a) the prosecutors' failure to advise defendants prior to trial of Gabriel's admitted past gang

activity and his extensive arrest record,[7] (b) the failure by the prosecution in the instant case to

conduct an ACS check at the time they were preparing Gabriel for his trial testimony (which

would have revealed the Illiana Task Force investigation), and (c) the failure of the Indiana FBI

---

[7]As noted above, the government also failed to provide defendants with information concerning Gabriel's prior arrests. Although arrests are ordinarily inadmissible to impeach a witness's credibility, combined with Gabriel's burglary conviction, his 2005 arrest for drug trafficking, and his admitted gang activity with a known, violent street gang, the arrests may have shed additional light on Gabriel's past and present criminal activities. At the last hearing held on December 16, 2009, defense counsel noted that had they been provided with Gabriel's "rap sheet" (that disclosed 18 arrests, including 8 for felony charges and the 2005 drug charge), they would have investigated Gabriel for current criminal activity, especially if they had also been informed of his prior gang membership.

agents to notify their counterparts in the Northern District of Illinois of their investigation of

Gabriel after they read the form 302s discussed above prior to the start of trial on March 3, 2009,

and again after they learned that Gabriel had been in contact with the Chicago FBI office during

the trial.

## **DISCUSSION**

### **Brady Standard**

In Brady v. Maryland, 373 U.S. 83, 88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the

Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution." This duty applies to both

exculpatory evidence and impeachment evidence, United States v. Bagley, 473 U.S. 667, 676,

105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), and extends to evidence "known only to police

investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438, 115 S. Ct. 1555,

131 L. Ed. 2d 490 (1995). Individual prosecutors have a duty "to learn of any favorable

evidence known to the others acting on the government's behalf in the case, including the

police." Id. However, the Seventh Circuit has made clear that neither Kyles nor existing circuit

precedent imposes a duty on the prosecutor's office to learn of information possessed by

government agencies that have no involvement in the investigation or prosecution at issue.

United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996).

To establish a Brady violation, a defendant must prove three elements: (1) the evidence at

issue was favorable to the defense, either because it was exculpatory or impeaching; (2) the

Government suppressed the evidence, either willfully or inadvertently; and (3) the evidence was

material to an issue at trial. Id.; United States v. Roberts, 534 F.3d 560, 572 (7th Cir. 2008).

Evidence is considered suppressed under Brady where: "(1) the prosecution failed to disclose the

evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise

available to the defendant through exercise of reasonable diligence." Carvajal v. Dominguez,

542 F.3d 561, 567 (7th Cir. 2008). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985).

Under these standards, the court has examined defendants' motions for a new trial in the instant case by analyzing three related issues: (a) whether Gabriel's testimony was material to the question of guilt or innocence of these defendants;[8] (b) whether the undisclosed evidence was admissible for purposes of impeachment; and (c) whether the government in this case was obligated to disclose that evidence.

**Materiality of Gabriel's Testimony**

As discussed earlier in this opinion, Gabriel's testimony was directed at both the *quid pro quo* underlying the allegedly fraudulent scheme to reward political work with City jobs and promotions, and the character of both defendants. With respect to Sanchez, Gabriel was the only witness to put distinctively incriminating words into Sanchez's mouth: "hard work deserves reward," which meant that working for HDO "would be rewarded with either employment or promotion or whatever." These words, unlike others recounted by several other government witnesses (such as "piece of the pie") literally fit the government's theory of rewards (jobs) for political activities directed by HDO leaders like Sanchez. Gabriel was also the only government witness to testify that he had been punished for not doing enough political work.

_____

[8] Because the evidence suppressed was impeaching rather than exculpatory, it is the materiality of the evidence that would have been impeached that is important.

In addition, Gabriel testified extensively about the "chain of command" for low-level coordinators, through mid-level operatives like Delvalle, up to the top leaders of HDO (like Sanchez). The term "chain of command" was used repeatedly by the government in its opening statement and closing argument to describe the scheme charged in the indictment. Gabriel also testified that he gave gifts of cigars and cash[9] to Sanchez, thus supporting the government's theory that defendants deprived the City of their honest services for personal gain. Finally, Gabriel testified that Sanchez never thanked him for these gifts, a direct attack on Sanchez's character as well as evidence that the gifts and cash were expected as a *quid pro quo* for Gabriel's City job.

With respect to Delvalle, Gabriel put him high in the "chain of command," supporting the government's theory that Delvalle lied to the Grand Jury when he denied any part of or intention to participate in a scheme to reward political work with City jobs. Of even greater significance, Gabriel testified that Delvalle made a pass at Gabriel's fiancee and that he and Delvalle had an altercation over the incident – a direct attack on Delvalle's character and defense strategy. As noted above, Delvalle presented his case to the jury as a clean-cut, hardworking family man who never intended to violate the law and kept his political activities separate from his City job. Consequently, according to Delvalle's defense theory, he testified honestly before the Grand Jury when he denied that he participated in the scheme alleged by the government.

To describe this testimony as immaterial is ludicrous. As the Supreme Court held in Strickler v. Greene, 527 U.S. 263, 280 (1999), evidence is material under Brady when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

[9]Gabriel was the only HDO witness to testify that he paid Sanchez in cash.

proceeding would have been different." Because, as discussed below, the undisclosed evidence would have thoroughly impeached Gabriel's testimony, it is the materiality of that testimony that is at issue in the instant motion. To win a new trial, defendants do not have to show "that disclosure of the suppressed evidence would have resulted ultimately in the defendants' acquittal"; all that is required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434-35. The court finds that had the government disclosed the impeaching evidence to defendants and put Gabriel on the witness stand, impeaching him with his recent criminal activity as well as his equally recent lies to the government would likely have affected the outcome of the case.

As the judge who presided over the trial in this case, the court notes that Gabriel's testimony stood out at the time he took the stand. Gabriel appeared to be a highly credible witness who impressed this court with the quality and substance of his testimony. Indeed, at the time Gabriel testified, he seemed to be more credible and relevant than many of the other government witnesses. His testimony tied the government's case together and, if believed by the jury, discredited both defendants' testimony denying that they had participated in a scheme to reward political work with City jobs and promotions.

Although when the "Notice to Court" was originally presented *in camera* by the government, AUSA Shah, in response to the questions by the court, stated that had the prosecution team known of Gabriel's recent criminal conduct they would not have called him as

a witness,[10] the court cannot un-ring that bell. Gabriel did testify, the jury did hear his testimony, and the jury did convict these defendants with that testimony firmly in mind. As defendants point out, had they been able to impeach Gabriel with the undisclosed evidence, that impeachment "would have made the government look foolish, desperate or worse. [Gabriel] lied to them, and they [the prosecution team] bought his story, mere days before his trial testimony."

For these reasons, the court finds that the evidence that would have impeached Gabriel's testimony was material.

**Admissibility of Undisclosed Evidence for Impeachment**

The government attempts to argue that the undisclosed evidence of Gabriel's gang activity, both past and present, along with his arrest record would not be admissible for impeachment purposes. The government is wrong. To be sure, evidence of gang activity, standing alone, can be inflammatory and raises the risk of unfair prejudice. United States v. Irvin, 87 F.3d 860, 864 (7th Cir. 1996). Likewise, arrests absent convictions and convictions for minor offenses, standing alone, are generally not admissible for impeachment. Nonetheless, the Seventh Circuit has held that evidence of gang membership is admissible for impeachment, to show bias, and to support theories of conspiracy and joint venture. United States v. Lewis, 910 F. 2d 1367, 1372 (7th Cir. 1990). What is clearly admissible under Fed. R. Evid. 608 is the fact that Gabriel lied to the government days before his testimony when he stated that his gang activity was long in the past. Such evidence is directly relevant to Gabriel's credibility (or lack of credibility), and follow-up questions would have been permissible. Thus, the defendants

---

[10]In a later brief (Docket No. 150, p.20), the government attempts to backtrack on this statement, suggesting that even had they know about the extent of Gabriel's criminal activities the prosecutors "may very well have presented Gabriel to the jury, warts and all . . .."

would have been allowed to cross examine Gabriel about the pretrial statements he made to the prosecution team in this case, and to expose the lies by asking him about his recent gang activity and drug dealing. If, as expected, he would have refused to answer based on his Fifth Amendment privilege, a negative inference would surely have been drawn by the jury. As defendants have noted in their post-trial submissions, Gabriel has been exposed as an "artful liar," having deceived this prosecution team as well as the jury in this case. If that is not permissible impeachment, this court does not know what is.

**Government's Obligation to Disclose Impeachment Evidence**

In examining the evidence that the government was required to disclose to the defense in this case, the court must determine what this prosecution team knew either actually or constructively. Kyles, 514 U.S. at 437-38. The evidence presented during the post-trial proceedings establishes the following:

(1)     The prosecution team actually knew of Gabriel's 1989 burglary conviction (which the government disclosed to defendants), Gabriel's past membership in the Spanish Vice Lords street gang (which the government did not disclose to the defense), and Gabriel's extensive arrest record (which the government did not disclose).[11]

(2)     The prosecution team in this case also knew that the ACS system was established to supply current information regarding any criminal investigation of witnesses such as Gabriel.

---

[11]Notably, in pretrial proceedings the government had agreed to provide all Brady material to the defense prior to trial.

(3)     The prosecution team in this case also knew that the Spanish Vice Lords

was a violent Chicago street gang, and that gang membership often

involved violence and drug dealing, along with other criminal activities.

(4)     The Illiana Task Force knew, prior to the beginning of the trial in this

case, that Gabriel had been identified as a "high ranking member" of the

Spanish Vice Lords, which was one of the street gangs being investigated

by the Illiana Task Force.  The Illiana Task Force members also knew that

Gabriel was actually dealing drugs in February 2009 (through the

controlled buys arranged by the Illiana Task Force), and that Gabriel had

been interviewed on two occasions by Chicago based FBI Agent Etchell in

connection with the Sanchez/HDO investigation.

(5)     Some time between February 25 and the end of the trial in this case,

perhaps before Gabriel testified, the members of the Illiana Task Force

knew that Gabriel had been in telephone communication with the Chicago

FBI office.  They also knew that the Sanchez trial ("a big case") was in

progress in Chicago.

Although there is no apparent case law supporting defendants' position that all of the

facts known to the Illiana Task Force should be "imputed" to the prosecution team in the instant

case, there is strong support for the notion that the Sanchez prosecution team's failure to disclose

what they did know and failure to investigate Gabriel further before presenting him as a witness

constituted a <u>Brady</u> violation that requires a new trial.  As the Supreme Court held in <u>Strickler</u>,

527 U.S. at 288, "under <u>Brady</u> an inadvertent non-disclosure has the same impact on the fairness

of the proceedings as deliberate concealment." The prosecution is tasked not only with disclosing evidence readily at its fingertips, but also performing investigative activities to "learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. "This means that prosecutors cannot use their failure to investigate to avoid their obligations under Brady." U.S. ex rel Erickson v. Shomig, 162 F. Supp. 2d 1020, 1052 (N.D. Ill 2001), citing Crivens v. Roth, 172 F.3d 991, 996 (7th Cir. 1999) (The prosecution "may not simply claim ignorance of Brady material."). The Seventh Circuit is in agreement with other circuits that have observed that "'[t]he availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state.'" Crivens, 172 F.3d at 997-998 (quoting United States v. Perdomo, 929 F.2d 967, 971 (3d Cir. 1991); see also Martinez v. Wainwright, 621 F.2d 184, 186-87 (5th Cir. 1980) (Brady violation found where prosecution had access to, but failed to turn over, rap sheet of decedent in murder trial); United States v. Auten, 632 F.2d 478, 481 (5th Cir. 1980) (Brady violation found where prosecutor did not run a National Crime Information Center [NCIC] search on one of the government's key witnesses because of the short interval before trial.).

Knowing that Gabriel had been a member of the Spanish Vice Lords street gang and that he had an extensive arrest record, including a 2005 drug trafficking arrest (long after Gabriel disclaimed involvement in gang activities), the prosecution team in this case should have, at the very least, disclosed that information to the defense and conducted an ACS search prior to putting him on the stand. Had they done so, the investigation then being conducted by the Illiana Task Force would have been revealed, and the court is confident that the prosecution team would have

disclosed this information to counsel for defendants. In other words, none of these extended post-trial proceedings would have been necessary because either Gabriel would not have been put on the stand at all, or he would have been impeached by the defense with the information disclosed pursuant to the government's <u>Brady</u> obligations.

The fact that the AUSAs and the agents in the instant case were subjectively unaware of the information known by the Illiana Task Force is immaterial. As the defense points out, this information was in the possession of the prosecution team because the Illiana investigation of Gabriel and the two controlled drug buys were in the ACS System on the computers of all FBI agents, including those on the prosecution team in Chicago. In other words, this information was actually in the possession of these agents, just as if it had been a hard copy report that was in an unread Sanchez file on Agent Etchell's desk. A simple click on the computer screen would have revealed this and avoided these proceedings.

Finally, the conduct of the Illiana Task Force is of great concern to this court, and should be of equally great concern to the law enforcement authorities in this and other districts. The testimony of FBI agents Iataroloa and Pohl and Chicago Police Sgt. Martin established that the Illiana Task Force team knew and had discussed: that Gabriel was deeply involved with Sanchez and the HDO (through the information, including the case file number, in the 302s); that the Sanchez trial was a major case proceeding in Chicago; that Gabriel was a "high ranking" member of a violent street gang that was currently being investigating; that Gabriel was a City employee at the same time he was a member of this violent gang and dealing drugs in Chicago; that that very same gang was in a war with another street gang in northern Indiana and Chicago at that time; and (at least prior to the end of the trial) that Gabriel had been in contact with the Chicago

FBI office after having been interviewed on two prior occasions by that office. A simple phone call from any member from the Illiana Task Force to Agent Etchell, whose name was on the form 302's in the possession of that Illiana Task Force, would have fully informed Agent Etchell of the relevant facts, and he would have informed the AUSAs immediately (as he did in April when this information became available to him).

Defendants urge the court to impute knowledge of the facts known by the Illiana Task Force to the prosecution team in the instant case based on a conclusion that the Illiana Task Force members deliberately concealed what they knew or made a conscious decision not to disclose it to the Sanchez team. Defendants would apply the "ostrich instruction" (Seventh Circuit Instruction 4.06, second paragraph) to the government. Under that standard, if a person "had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his/her eyes for fear of what he/she would learn, [the jury] may conclude that he/she acted knowingly." Indeed, prosecutors often ask for this instruction to be applied to defendants (as they successfully did in this case) when knowledge is an element of the offense. Because the court has concluded that a new trial is required by the prosecutors' failure to disclose Gabriel's gang activity and arrest record, and their failure to conduct an ACS search before presenting Gabriel as a witness, the court need not reach this issue. Were the court to find deliberate concealment of <u>Brady</u> material by a neighboring FBI office (or the local police department), the instant motion would take an even more disturbing and ominous turn. The issue simply need not be decided in the instant case.

## CONCLUSION

For the foregoing reasons the court finds that, (a) the evidence that would have impeached Gabriel's testimony was material, (b) the undisclosed evidence was admissible for purposes of impeachment, (c) the government was obligated, but failed to disclose Gabriel's prior gang activity and his arrest record, and (d) the government was obligated, but failed to perform an ACS search prior to presenting Gabriel as a witness at trial.  Based on these findings, this court has lost confidence in the integrity of the verdict convicting these defendants.  The defendants' motions for a new trial are granted.

**ENTER:**      **December 22, 2009**

**Robert W. Gettleman**
**United States District Judge**